Peb CüRIAM.
 

 The bill states that complainant’s father, Nicholas Long, died in 1798, having devised to seven of his children, one of whom is the complainant, a tract of land of 5,000 acres, near the town of Columbia, in Murray County; these devisees sold 400 acres of the said land to one Williamson, 100 acres to Goodloe, and 400 acres to Peter R. Booker, and that they authorized com
 
 *370
 
 plain ant to sell 250 acres so as not to interfere with what had been sold; that complainant accordingly sold to the defendant, William Dooley, 250 acres, who was well acquainted with the boundaries of the 5,000 acre tract, and with the several tracts sold out of it, above stated ; and stated to him expressly, that he would not sell or convey any part contained within the bounds conveyed to Williamson and Goodloe, and that the defendant declared, when he came to get his deed, that the boundaries thereof did not include any of the above lands sold to Williamson and Goodloe; whereas the defendant did not know and the fact is, that the northern boundary of this tract covers 40 acres of Goodloe’s and his western boundary covers 19 acres of Williamson’s. The answer states, that defendant, * on the 13th September, 1808, purchased from complainant 250 acres at $4 per acre, and received from him a written memorandum thereof as follows, to wit: “ I have sold to William Dooley 250 acres of land, so as to include where he now lives, beginning at two sugar
 
 trees,
 
 Peter R. Booker’s southwest cornei’, then west, 200 poles; then north, 200 poles; then east, 200 poles; then south, 200 poles, to the beginning.” Signed, John Joseph Long.
 

 Defendant admits, that soon after this he heard of Williamson running out the land he afterwards purchased, and informed Long of it, who, appearing uneasy, defendant agreed to be bounded by his, Williamson’s, line if he had purchased, or procure Williamson to extend no further than his line ; that on the 24th December, 1808, he entered into articles with complainant, specifying their contract more particularly, and at the same time made the first payment pursuant to the same, of
 
 $500;
 
 but before the articles were drawn, defendant told Long he wanted the matter about Williamson’s line settled and understood between them, that he believed Williamson bad not purchased. Long replied he knew he had not, and that defendant might do as he pleased. Defendant then informed him he would take the land contracted for, and so the articles were drawn and executed by them. Defendant denies that he had any conversation with complainant about Goodloe’s land, or that he was informed or knew of Goodloe’s claim near his ■land, until after the execution of the said articles and the payment of the $500, and also denies that complainant ever told him, before the date of the conveyance to him, that he was authorized to sell
 
 *371
 
 200 acres so as not to interfere with the lands of Goodloe and Williamson, and that he never viewed the land to ascertain how 200 acres might he laid off so as not to interfere with them. Defendant paid the last payment on the 14th December, 1809, and got his deed according to his contract, and * no objection was made on account of interferences of Goodloe or Williamson, or even mention made of them.
 

 Barne’s deposition was read on the part of the plaintiff. It stated that in August or September, 1808, Dooley, in conversation with complainant, said the land he was buying would not interfere with the lands which had been sold by the heirs of Long. Watson’s deposition, on the same side, stated that in August or September, 1808, in a conversation between plaintiff and defendant, defendant said he would stop at the lines sold by the heirs of Long, and said that the land purchased by him did not and could not interfere with any land sold by the heirs of Long. Rutledge’s deposition also states, that in a conversation between plaintiff and defendant, the defendant said he would stop at Williamson’s line if Williamson had purchased, or Williamson should stop at his line. Willis’s deposition, on the same side, states that on the 24th of December, 1808, when the articles of agreement were executed, defendant agreed to lay off the land in such form as not to interfere with Williamson’s, and he further said it would not interfere with it; does not remember that anything was said about Goodloe’s tract. Several depositions were read on the part of the defendant, but unnecessary to be noticed from the view that I take of the case.
 

 This bill is brought to establish a different contract from the one that has been exhibited between these parties; the one that has been executed is a written one, and the bill charges that a term of the real contract is different from what is written. That the execution being according to the written and not according to the real agreement, it prays that the real one, which rests as to this term upon parol proof, may be established and executed, and the execution of the written contract so far set aside as is inconsistent with this alteration or term. The bill charges, that the 40 acres included * within Goodloe’s deed, and the 18 acres included within Williamson’s deed, was agreed by the defendant, Dooley, not to be included within the contract between them, and not to be conveyed by the deed from the complainant to the de
 
 *372
 
 fendant; and prays that the defendant, by decree of this court, may be compelled to take this quantity of 40 acres and 18 acres, the interferences of Williamson and Groodloe’s claims, out of
 
 complainant’s
 
 land lying to the south óf defendant’s tract as at present conveyed to him; and that the defendant may be divested of all right and title in and to the said interferences of 40 acres and 18 acres.
 

 Suppose an action at law had been brought upon the articles by Dooley against Long, for not making a conveyance pursuant to the agreement therein contained, would it have been competent for Long to have introduced parol evidence to show that the land agreed to be conveyed by the articles, beginning at Peter
 
 R.
 
 Booker’s southwest corner on two sugar trees, thence west, 200 poles, thence north, at right angles, so as to make the said quantity, which forms a square figure containing 250 acres in four lines, was agreed by the parties to be varied in running the same, by making offsets, so as to void the claims of Williamson and Goodloe, and form a figure bounded by eight lines, containing not 200 acres, or if to contain the proper quantity, to make still greater alterations contrary to the articles ? Surely not, for parol evidence cannot be received to contradict a written agreement; the written instrument must be considered as containing the true agreement between the parties, and as furnishing better evidence than any which can be supplied by parol. The l’eason assigned by Lord Coke is, it would be inconvenient that matters in writing, made on consideration, and which finally import the certain truth of the agreement of the parties, should be controlled by an averment of the parties, or be proved by * the uncertain testimony of slippery memory. The rules of evidence are the same in courts of equity as of common law. It is a general principle established in the former no less than in the latter, that parol evidence of the intention of the parties is not admissible to vary or add to the terms of a written agreement, if the agreement is certain, explained in writing, and signed by the parties that binds them. If not certain, and parol evidence is necessary to prove what the terms were, to admit such evidence would effectually break in upon the statute of frauds, and introduce all the mischiefs, inconvenience, and uncertainty which the statute meant to prevent. In the case, therefore, of
 
 Rich
 
 v.
 
 Jackson
 
 (4 Br. Ch. 6, 515; 6 Ves. junior, 334) on a bill for a specific performance, the Court of Chancery gave the
 
 *373
 
 samé judgment against the admissibility of parol evidence varying a written contract, that had been given before by the Court of Common Pleas in action between the same parties. The question, said Lord Rosslyn, in that case, is, whether in equity any more than at law, such evidence ought to be admitted; whether there is any distinction in a court of equity, where a party comes to enforce a written agreement by obtaining a more formal instrument, and to add to, in doing that, a term not expressed in the written agreement. I have looked into all the cases, says he, and cannot find that this court has ever taken upon itself, in executing a written agreement by special performance, to add to it by any circumstance that parol evidence could introduce.
 

 When a court of equity is called upon to exercise its peculiar jurisdiction by decreeing a specific performance, the party to he charged, the defendant, is admitted to show that under the circumstances the plaintiff is not entitled to have the agreement specifically performed ; the admission is frequent; it is used to rebut on equity. The defendant says, the agreement you seek is not the agreement I meant to enter * into, and then he is let in to prove fraud and mistake (1 Shoal
 
 &
 
 Lefray, 30); for the court will not give relief unless it is satisfied under all the circumstances it is equitable to do so. But whether a plaintiff in a court of equity, on a hill for a specific performance of a written agreement, can in any case be admitted to prove that some terms of the agreement have been omitted, or varied by fraud, mistake, or surprise, and that the agreement is different from what the parties intended, is a much more difficult question, and the cases are hardly reconcilable. But the late case of
 
 Woollam
 
 v.
 
 Ilecerne,
 
 7 Ves. junior, 211, seems to have settled the doctrine on this subject. The plaintiff there filed his bill for the specific performance of a lease, and the Master of the Rolls, in giving judgment, says, that by the rule of law independent of the statute of frauds, parol evidence could not be received to contradict a written agreement. To admit it for the purpose of proving that the written instrument does not contain the real agreement, would be the same as receiving it for every purpose. It was for the purpose of shutting out that inquiry the rule of law was adopted. Though the written instrument does not contain the terms, it must, in contemplation of law, be taken to contain the agreement, as furnishing better evidence
 
 *374
 
 than any parol may supply. This evidence, continues the Master of the Rolls, is not offered for the purpose of resisting, but of obtaining a decree, first to falsify a written agreement, and then to substitute in its place a parol agreement to be executed by the court. Thinking as I do, that the statute has been already too much broken in upon by supposed equitable exceptions, I shall go no further in receiving and giving effect to parol evidence. There is no case in which the court has gone the length now desired. The Master of the Rolls concludes thus : The evidence offered in this case is to vary an agreement in a material part, and having varied it, to procure it to be executed in * another form. There is nothing to show this ought to be done, and the bill was dismissed. So in the present case, the fraud and the variation in the written contract charged in the bill being denied and put in issue, I think the parol testimony read in this case ought to form no part of it, by the rules of law. But independent of this ground, and admitting the plaintiff’s testimony to be legal, when weighed with the testimony on the other side, no foundation appears for a decree in favor of the
 
 complainant;
 
 his bill must therefore be dismissed with costs.
 

 See, as to
 
 evidence in courts of law and
 
 equity,
 
 Meek
 
 v.
 
 Bearden,
 
 5 Yer. 467, Code, 4455. See King’s Digest, 2164, 2860, 2861, 9754.